*In re* ESTATE OF ANNA L. HILL, Deceased.—(JOSEPH LOWE *et al.*, Petitioners-Appellants, *v.* GORDON KERR, Adm'r of the Estate of Anna L. Hill, Defendant-Appellee.)

Fifth District   No. 79-437

Opinion filed September 17, 1980.

Geittmann & Jackson, of Metropolis, for appellants.

Lahr & Sibley, of Metropolis, for appellee.

Mr. JUSTICE KASSERMAN delivered the opinion of the court:

Joseph Lowe and Jesse Samuel Lowe appeal from an order of the Circuit Court of Massac County disallowing their claims against the estate of their sister, Anna L. Hill. Claimants sought reimbursement for monetary support furnished to Anna during her lifetime.

On November 16, 1978, Joseph Lowe filed a claim in the amount of

$4,600 against Anna's estate to recover money he allegedly advanced to Anna for her support and maintenance. On the same day Jesse Samuel Lowe filed a similar claim for $3,480.

At the hearing on the claims on February 13, 1979, Joseph Lowe testified that after his mother died Anna was left alone and that he "got to thinking" if "some of the other boys would help some, I could give Anna some and they could give her some and with her social security she could make out fine." He further related that although a brother Jim paid $20 three or four times, he contributed no more. Joseph stated he regularly sent Anna monthly checks in the amount of $50, that his brother, Jesse Samuel Lowe, was sending Anna $40 per month and that no members of the family other than he and Jesse Samuel made such payments except the few dollars sent by Jim. The practice of sending checks started in December 1970 and did not cease until Anna's death in March 1978. He explained that the checks were a necessary supplement to Anna's income, because Anna lived alone and was unable to work and could not subsist solely on her monthly social security check.

Over the objection of counsel for the administrator of Anna's estate, Joseph Lowe testified relative to Jesse Samuel's claim alone. He stated that he had discussions with Anna concerning the monthly checks and that on two occasions Anna assured him that he and his brother would be repaid. On cross-examination he stated that there was no written agreement acknowledging Anna's intent to repay the sums received by her. He added that Anna died intestate.

Jesse Samuel Lowe testified that from December 1970, to January 1978 he sent Anna $40 each month; however, he stated that he had no conversations with Anna relative to repayment of such sums. Canceled checks representing his payments and those of his brother were introduced into evidence.

In an order entered on July 9, 1979, the trial court ruled:

"* * * [T]he court doth find that both claimants have failed to overcome the presumption at law that support furnished to a member of the immediate family is gratuitous, the court further finding that the doctrine of quasi-contract is inapplicable to these claims filed against the estate. Therefore, an order is hereby entered disallowing both claims filed against the estate."

On appeal claimants contend: (1) that the presumption that monetary support furnished by adult brothers to an adult sister residing in a separate household is gratuitous does not apply under the facts of this case, and (2) that persons who have provided monetary support are prima facie entitled to restitution from the estate of the person receiving such support.

It has long been the law in Illinois that a person who furnishes

services to a family member is presumed to do so gratuitously and that the parties do not contemplate payment of wages therefor; however, the presumption may be overcome by proof. (*Heffron v. Brown* (1895), 155 Ill. 322, 40 N.E. 583; *In re Estate of Foster* (1964), 46 Ill. App. 2d 319, 197 N.E.2d 257.) Although these cases deal with the furnishing of services, we perceive no reason for support payments being given any different status; therefore, we conclude that the same presumption would result from the contribution of funds or support to a family member.

Although claimants were brothers of Anna, they contend that their relationship to her was not of the type nor sufficient to invoke the presumption that their monetary support was gratuitous. In support of their contention they emphasize the fact that neither of them lived in the same house with Anna. They rely on *Brooks v. Ostrander* (1910), 158 Ill. App. 78, for the proposition that adult brothers and an adult sister residing in separate households do not share a family relationship for purposes of the above mentioned presumption.

In *Brooks*, claimants, the brother and sister-in-law of decedent, filed two claims seeking payment for services rendered in caring for decedent, who was an elderly man suffering from a heart disease and requiring constant care. Decedent wrote his brother, who lived in New York, and requested that his brother come to Illinois and take care of him. The brother and wife moved into decedent's home and attended to his needs until his death. Two witnesses at the trial testified that the brother and his wife moved to Illinois solely in response to his brother's request. In upholding the jury's allowance of the claims, the court noted that under the facts of the case, the jury could not have found other than that there was a contract under which the services were rendered to decedent.

Although the appellate court in *Brooks* stated that the claimant was not a member of the family of the decedent, we do not consider the decision in *Brooks* to be as broad as they urged by the claimants in this cause. The decisive factor in *Brooks* was not that the claimants had lived in a separate household from decedent, but rather that there was a contract under which the claimants furnished services to decedent. We note that the *Brooks* court concluded that if services are rendered by one member of a family to another, the mere fact of the rendering of the service "will not raise an implied contract to pay for such services. There must be other evidence from which a contract may be inferred." (158 Ill. App. 78, 80-81.) Thus, in determining controversies based on evidence comparable to the case at bar, the court in *Brooks* applied a different standard (that no contract would be implied) than the courts used in *Heffron v. Brown* and *In re Estate of Foster* (that the services would be presumed to be gratuitous).

However slight the results might be in applying the presumption of

gratuity referred to in *Heffron* and in *Foster* and the rationale that the rendition of the services would not give rise to an implied contract, as stated in *Brooks*, any distinction was removed by the court's decision in *In re Estate of Clausen* (1977), 51 Ill. App. 3d 18, 366 N.E.2d 162, which cited with approval *In re Estate of Foster*. It was there stated that where the claimant and the decedent were brother and sister and lived together as a family with mutual dependence, "* * * a presumption arises that the services rendered were intended to be gratuitous. [Citation.] To rebut that presumption, there must be a showing that decedent expected to pay for the services and that claimant expected to be paid." 51 Ill. App. 3d 18, 21, 366 N.E.2d 162, 164.

■■ Therefore, we conclude in the case at bar that claimants' status as brothers of Anna Hill was sufficient to raise the presumption at trial that the money they supplied to Anna was done so gratuitously.

Although such a presumption exists, it is not irrebuttable and may be overcome by evidence of an express contract "or of a contract established by such facts and circumstances as show that both parties, at the time the services were rendered, contemplated or intended pecuniary recompense other than that which arises naturally out of the family relation. [Citation.]" *Heffron v. Brown*, 155 Ill. 322, 326; *cf. In re Estate of Foster*, 46 Ill. App. 2d 319, 327, 197 N.E.2d 247, 261.

Appellee contends that claimants cannot establish the existence of a contract by the introduction of evidence of conversations between decedent and her brothers because of the provisions of the Dead Man's Act (Ill. Rev. Stat. 1977, ch. 51, par. 2.)

■■ As evidence of a contract for repayment, Jesse Samuel Lowe relies on the testimony of Joseph Lowe concerning discussions Joseph had with Anna in which she informed him that Jesse Samuel would be repaid for whatever amount of money she received from him. This evidence can not be considered relative to Joseph's claim, however, because it is inadmissible by virtue of the Dead Man's Act, which prohibits a party in a civil action from testifying on his own motion or behalf as to any conversation with decedent when the adverse party sues or defends as an executor or administrator. (*Simon v. Plotkin* (1977), 50 Ill. App. 3d 603, 365 N.E.2d 1022.) In spite of the fact that the claims of Joseph and Jesse Samuel were joined for hearing on motion of claimants, the Dead Man's Act is still no bar to the court's consideration of Joseph's testimony relative to Jesse Samuel's claim. Thus, such evidence is admissible as to Jesse Samuel's claim, but it is inadmissible as to the claim of Joseph.

■■■ We recognize that Joseph's testimony regarding conversations with the decedent concerning the alleged agreement to repay Jesse Samuel was hearsay evidence. However, by failing to object to its introduction on that ground, the estate has waived such objection.

Further, from an examination of the record we concluded that the statements attributed to decedent do not constitute an unequivocal promise on the part of the decedent to repay Jesse Samuel for the sums contributed to her by him. According to Joseph the decedent, in the spring of 1971, said for them not to worry that they "shall be repaid." He further stated that a short time later he told decedent "the people that is not helping you any is going to benefit from whatever you leave," and that he remarked to her "I would like for you to write a Will, to make out a will and I said you can make this out to anybody you want to, just so Jim and the Shelton's don't get hold of none of it because they are not helping you one bit, they are not even coming to see you." According to Joseph the decedent replied "I will make it out." Joseph further testified that decedent said on numerous occasions there were short conversations similar to the first ones "about not to worry that you will be repaid."

When asked on cross-examination whether he had any will which is purported to have been executed by decedent, Joseph testified: "She never wrote a Will that I know of. She agreed to, but like I said I stalled around and never did take her to a lawyer, I spoke to Mr. Geittmann [claimants' attorney] about it once and he said you bring her up."

Jesse Samuel Lowe testified that he did not have any conversations with the decedent about the payments he made to her.

We do not perceive decedent's statement that she would make a will to be indicative of an intent to see that claimants are repaid for the sums contributed by them. In fact, according to Joseph's own testimony, it was he who elicited her statement that she would make a will in response to his suggestion, not that property be left to him and Jesse Samuel, but that the will be made out "to anybody you want to, just so Jim and the Shelton's don't get hold of none of it because they are not helping you [decedent] one bit, they are not even coming to see you."

We find nothing in the record to suggest that the payments by claimants were motivated by anything other than concern for Anna engendered by their relationship to her. It is noteworthy that the payments were initiated on a voluntary basis under a commendable plan suggested by Joseph and that no tangible evidence of the transaction exists other than the canceled checks. Decedent did not execute a will as she allegedly stated she wished to do in the hearsay testimony of Joseph with respect to Jesse Samuel's claim. She did not converse with Jesse Samuel concerning her alleged intention that either brother would be repaid. She prepared no writing to indicate that such was her intention.

The only evidence presented as to decedent's intention to repay any sums received by her was the testimony of Joseph which was inadmissible to support his claim and admissible only as to the claim of Jesse Samuel. In this regard we find the testimony of Joseph significant:

"* * * Anna's social security was coming along then and I got to thinking that Anna was there by herself now and the house paid for and everything, if some of the other boys would help some, I could give Anna some and they could give her some and with her social security she could make out fine.

Q. Did you then contact members of your family about this?

A. Yes, I contacted Jim and he agreed to and he never paid but 3 or maybe 4 $20.00 bills, that was $20.00 at the time over a three month period I guess and he never paid no more, but I contacted Sam and he is also Jessie on the paper there, and I contacted him at the same time and he said he would contribute $40.00, and I said I would give $50.00 and we both did and with that $90.00 and her $60.00 something social security, Anna didn't have any worries because she never got out and done any running around. * * *"

The court in *In re Estate of Foster* stated: "The general rule is that where services are rendered by one person for another [not related to him], which are knowingly and voluntarily accepted, without more, the law presumes that such services were given and received in the expectation of being paid for, and implies a promise to pay their reasonable worth. [Citations.]" 46 Ill. App. 2d 319, 326, 197 N.E.2d 257, 260.

Based on that portion of Joseph's testimony concerning the origin of the plan to provide support for Anna, it is apparent that the support to be furnished by the brothers was not initially given and received in the expectation of being paid for; therefore, it is our opinion that Joseph's testimony would have served to rebut any implied promise on the part of an unrelated recipient to pay their reasonable worth referred to by the court in *In re Foster's Estate* when considering the law applicable to situations where services are performed by one person for another who is not related to him. Thus, it is our opinion that Joseph and Jesse Samuel would not be entitled to reimbursement from the estate of Anna on the evidence presented at trial had they not been related to her in any way.

On the basis of the evidence before us, we conclude that the claimants have not rebutted the presumption that the sums they contributed to their sister, Anna, were done so gratuitously.

Having made this determination, we need not consider claimants' second issue on appeal.

For the reasons stated above, we conclude that the trial court properly denied these claims, and we affirm the order of the Circuit Court of Massac County.

Affirmed.

HARRISON and SPOMER, JJ., concur.