**Johnnie BROWN (Estate of Sarah Key), Appellant,**

v.

**Thomas P. BROWN III, Appellee.**

**No. 86–255.**

District of Columbia Court of Appeals.

Submitted Dec. 4, 1986.
Decided April 22, 1987.

William B. Barton, Washington, D.C., for appellant Johnnie Brown.

Thomas P. Brown, III, Washington, D.C., pro se.

FERREN, Associate Judge:

Appellant, Johnnie Brown, challenges a trial court order following a bench trial denying his claims against the estate of his sister, Sarah Key. Appellant filed separate claims for personal services rendered and money spent on her behalf before her death. We agree with appellant that the trial court applied an incorrect legal standard in deciding his claims for services rendered. Moreover, the trial court failed to address appellant's claim for money spent on behalf of Ms. Key. We therefore must reverse and remand for further consideration.

## I.

Sarah Key died on August 28, 1984 after a long illness. Before her death she had been confined at Howard University Hospital on two separate occasions for lengthy periods of time. While Ms. Key was in the hospital, appellant had looked after her home. Upon Ms. Key's last release from the hospital in early May 1984, appellant had left his home and moved into hers to provide the full-time nursing care his sister required. Appellant testified that, except for doing necessary errands, he had remained at his sister's home continuously, meaning 24 hours a day, until she died three and a half months later. Appellant claimed he had paid his sister's bills, including funeral expenses, cooked her meals, cleaned the house, done the laundry, changed her bedpan, and had provided other practical nursing care. After Ms. Key's death, appellant filed a claim with the estate's personal representative totaling $10,000 for personal services plus $1,118 representing the amount appellant allegedly had spent on Ms. Key's behalf.[1] Appellant filed his claim after discovering he had not been named a beneficiary in his sister's will.

At trial, appellant testified that he had performed the services pursuant to an oral contract with his sister. According to appellant, Ms. Key had promised to pay him for his services sometime in the future. He further testified that she had asked him to stay with her after she left the hospital and had reassured him that he would "be well paid."

Appellant attempted to corroborate the existence of this alleged contract with the testimony of several of his sister's neighbors, who indicated that Ms. Key had told them appellant would be rewarded for his help. May Warren testified that, shortly before Ms. Key's death, she had told Warren that appellant was taking care of her and would be paid well for his actions. Bilbo Clayborn, Ms. Key's next door neighbor, testified that the decedent had told him "she would see that he [appellant] got paid for his time." On cross-examination, however, Mr. Clayborn could not recall the specific date of this conversation, and he admitted that Ms. Key had not indicated how much she would pay appellant. Mrs.

---

1. Appellant testified that he had spent, from his own money, $950 on funeral arrangements, $125 for his sister's mortgage, and $43 for nursing care.

Arnold, another neighbor, testified that Ms. Key had told her, in appellant's presence, that appellant would be paid "for all the things he had ever done for her." Mrs. Arnold, too, admitted that Ms. Key had not mentioned any specific sum she would give to appellant. Nor had she said when she would pay him. Finally, Shirley Marie Nelson, a friend of the decedent's, testified that Ms. Key had told her she was going to change her will to compensate appellant for the money he had spent on her and the things he had done for her.

Appellee Brown, the personal representative of Sarah Key's estate, presented the testimony of two witnesses, one of whom stated that Ms. Key had told her she would only leave her property to appellant as a "last resort." The other witness testified that, for many years, she had assisted Ms. Key with her bills and that Ms. Key usually had had money left over each month after payment of all her bills.

In its post-trial order, the trial court denied appellant's claim for compensation for services rendered. Relying on a presumption that services rendered by one family member to another are gratuitous in the absence of conclusive evidence of an agreement to pay, the trial court found that appellant "offered no convincing corroborating evidence to prove the existence of an agreement with his sister." The trial court did not address appellant's claim for money

spent on behalf of his sister. *See supra* note 1.

## II.

■ With respect to his claim for personal services, appellant asserts several grounds for reversal. Only one of these, however, merits substantial discussion. Appellant challenges the court's reliance on a presumption that services rendered by one sibling to another are intended to be gratuitous.[2]

### A.

■ We note at the outset that ordinarily, in the absence of a close family relationship, a promise to pay will be implied in law when one party renders valuable services that the other party knowingly and voluntarily accepts. *E.g., Zaleski v. Congregation of the Sacred Hearts of Jesus and Mary,* 256 A.2d 424 (D.C.1969). Actually, a claim based on a contract implied in law (sometimes called a quasi-contract) "is not a contract [claim] at all, but [results from] a duty trust under certain conditions upon one party to require another in order to avoid the former's unjust enrichment." *Bloomgarden v. Coyer,* 156 U.S. App.D.C. 109, 116, 479 F.2d 201, 208 (1973) (footnote omitted) (adopted in *H.G. Smithy Co. v. Washington Medical Center,* 374 A.2d 891, 893 (D.C.1977); *see also TVL Associates v. A & M Construction Corp.,* 474 A.2d 156,

---

**2.** Appellant also argues that the trial court unlawfully disregarded his corroborating evidence. He is incorrect. The court acknowledged that several witnesses testified the decedent had stated she wanted to repay appellant for all he had done for her, but the court correctly observed that none of the witnesses had claimed the decedent had mentioned a specific contract. The trial court also found appellant's own testimony, that he had entered into an oral contract with his sister, was not credible. (Appellee Brown had vigorously cross-examined appellant and revealed several inconsistencies in his story.) Accordingly, the court determined that appellant had not established a contract existed. Although we conclude, *infra,* that the trial court applied an incorrect burden of persuasion, it did not disregard appellant's corroborating evidence. "[S]ince the trial court heard the testimony and was in a position to evaluate the witnesses' credibility, we defer to its resolution of conflicts in the testimony." *Auxier v.*

*Kraisel,* 466 A.2d 416, 418 (D.C.1983) (per curiam, as amended). Thus, we must accept the trial court's resolution of factual disputes as presumptively correct and uphold its findings unless they are clearly erroneous. *See* D.C.Code § 17–305 (1981); *Bell v. Jones,* 523 A.2d 982, 992 (D.C.1986); *Edmund J. Flynn Co. v. LaVay,* 431 A.2d 543, 546 (D.C.1981).

Appellant also complains that the trial court erred in considering evidence of the decedent's decision, against medical advice but with appellant's encouragement, to return home from the hospital instead of going into a nursing home, and of appellant's decision not to file a claim until after he had discovered he was not a beneficiary under the will. The trial court considered this evidence probative of whether a contract existed between appellant and Ms. Key. We cannot say the trial court erred in attaching some weight to this evidence. Finally, appellant's assertion that the trial court showed a predisposition toward appellee is frivolous.

159 (D.C.1984). When, however, there is an applicable presumption that the services were rendered gratuitously—as occurs, for example, in the context of a parent-child relationship, *see Tuohy v. Trail*, 19 App. D.C. 79 (1901)—a promise to pay obviously cannot be implied by the mere rendition and acceptance of valuable services. The presumption itself, as a matter of law, negates any implication that "it would be unjust[9] for the recipient to retain the benefit conferred" without paying for it. *H.G. Smithy Co.*, 374 A.2d at 895; *see also Farrin v. Harlow*, 62 App.D.C. 314, 67 F.2d 580 (1933) (where plaintiffs rendered nursing services for eleven years to decedent, to whom they were not related but with whom they lived as a family, court, without explicitly invoking presumption, concluded services were gratuitous, not contractual). It follows, then, that when a presumption of gratuity is applicable—as the trial court held in this case—a claimant may only recover, if at all, by rebutting that presumption with evidence of an express contract or a contract implied in fact.

### B.

We turn, therefore, to the question whether the trial court was correct in premising this case on a presumption of gratuity. In *Tuohy*, 19 App.D.C. at 87, the court held that when a daughter performs services for her father there is a rebuttable presumption that the parties did not intend payment for those services. Such services are presumed to be gratuitous, and thus a promise to pay is not implied by the mere rendition of the services by one party and their acceptance by the other. Annotation, *Recovery For Services Rendered By Member of Family*, 7 A.L.R.2d 8, 15 (1949). The rationale behind this presumption was aptly summarized by the Arkansas Supreme Court in *Capps v. Cline*:

> Such services are enjoined by the reciprocal duties of the family relation, and are always presumed to have been prompted by natural love rather than by the promise or the hope of pecuniary reward. "Courts are reluctant to infer a pecuniary recompense from performance of filial or parental duties such as humanity enjoins." Hence the burden is upon [the person] who claims a money recompense for personal services performed, whether voluntarily, or upon the request of the other, to establish a contract expressed or implied for such consideration.

227 Ark. 201, 203, 297 S.W.2d 654, 655 (1957) (quoting *Williams v. Walden*, 82 Ark. 136, 141, 100 S.W. 898, 900 (1907); *see also* 66 Am.Jur.2d *Restitution and Implied Contracts* § 31 (1973).

■ Although *Tuohy* concerned services performed in the context of a father-daughter relationship, we conclude that the same analysis applies to services rendered by one sibling for another. While it is true, of course, that as the family relationship becomes more remote there is a lesser likelihood that services will be given without expectation of payment, we believe the sibling relationship is inherently close enough to sustain the presumption that services by a brother for an ailing sister, and vice versa, are rendered gratuitously. *See, e.g., Capps*, 227 Ark. at 203, 297 S.W.2d at 655; *Lamb v. Jones*, 202 So.2d 810, 815 (Fla. Dist.Ct.App.1967); *In re Estate of Hill*, 88 Ill.App.3d 1038, 1039, 44 Ill.Dec. 171, 173, 411 N.E.2d 77, 79 (1980); *In re Estate of Clausen*, 51 Ill.App.3d 18, 9 Ill.Dec. 48, 366 N.E.2d 162 (1977); *In re Estate of Raketti*, 340 N.W.2d 894, 902 (N.D.1983); *Salmon v. Salmon*, 406 S.W.2d 949 (Tex.Civ.App. 1966). This approach is especially important in light of the fact that, absent a presumption of gratuity, there is a virtual presumption of a (quasi) contract—a contract implied in law—premised on unjust enrichment theory. We therefore reject authorities holding such a presumption does not necessarily apply to a brother-sister relationship. *See Gibson v. McCraw*, 332 S.E.2d 269, 273 (W.Va.1985); Annotation, *Recovery For Services Rendered by Member of Family*, 7 A.L.R.2d 8, 103 (1949) (citing cases); 66 Am.Jur.2d *Restitution and Implied Contracts* § 53 (1973) ("The mere relation existing between brothers, sisters, or brother and sister, is not sufficient to authorize a presumption that services performed by one for the other are gratuitous").

We agree with the Supreme Court of North Dakota that, "[r]ather than affecting the 'strength' of the presumption, the degree and nature of the family relationship [between brother and sister] are factors which may be considered in determining whether or not an implied agreement for compensation existed." *In re Estate of Raketti*, 340 N.W.2d at 902 (footnote omitted). While we, too, realize that "this may very well lead to the same result as holding that the presumption grows weaker as the family relationship becomes more remote," we believe "it is better to say that the presumption unconditionally shifts the burden [of persuasion to the claimant], and the nature and degree of the relationship are factors to be considered in determining whether or not the claimant has satisfactorily rebutted the presumption." *Id.* at 902 n. 5.

Because the presumption of gratuitous services between siblings shifts the burden of persuasion, it is not premised on "the 'bursting bubble' theory"; it does not "place[ ] on the opponent only the burden of production of evidence" which, if satisfied, causes the presumption to vanish. *Green v. District of Columbia Department of Employment Services*, 499 A.2d 870, 874 (D.C.1985). Although the "bursting bubble theory is 'the prevailing view, to which jurists preponderantly have subscribed' " in characterizing particular presumptions, *Green*, 499 A.2d at 874 (quoting *Legille v. Dann*, 178 U.S.App.D.C. 78, 83, 544 F.2d 1, 6 (1976)), this court, on several occasions, has recognized exceptions. In *Green*, for example, we recently held that

under the Unemployment Compensation Act, D.C.Code §§ 46–101 to 46–127 (1981), the employer bears the burden of persuasion in proving that an employee voluntarily left his or her job and thus is not entitled to benefits.[3]

As in *Green*, "[s]ubstantial policy considerations," 499 A.2d at 875, underlie the presumption that services rendered between siblings are gratuitous. We believe that, as a matter of common human experience, such services are usually performed out of a sense of family responsibility, not pursuant to a contractual agreement with the legitimate expectation of payment. If we were to employ only a "bursting bubble" presumption (which has no evidentiary weight once rebutted by some evidence to the contrary), that approach could lead too readily to a finding that a contract existed when, because of the sibling relationship, none was intended; once the bubble was burst, little if anything would prevent a conclusion that a contract was implied in law.[4]

### C.

We turn next to rebuttal of the presumption. It "may be overthrown, and the reverse established by proof of an express or implied contract to that effect; an implied contract being proven by facts and circumstances which show that both parties, at the time the services were performed, contemplated or intended pecuniary recompense." *Tuohy*, 19 App.D.C. at 87.[5] Neither in *Tuohy*, however, nor in any other case we have been able to find has a court

---

**3.** Other presumptions impose the burden of persuasion on the party against whom the presumption operates. *E.g., Davis v. Altmann*, 492 A.2d 884 (D.C.1985) (presumption that joint account opened without consideration is established for convenience of party who opens it); *Johnson v. Young*, 372 A.2d 992 (D.C.1977) (presumption that, where there is more than one marriage, the more recent is valid); *Alsbrooks v. Washington Deliveries, Inc.*, 281 A.2d 220 (D.C. 1971) (statutory presumption that owner of motor vehicle has consented to operator's use); *Somerville v. The Knights Templars and Masons' Life Indemn. Ass'n*, 11 App.D.C. 417 (1897) (presumption that death is caused by accident rather than by suicide).

**4.** At least one court has applied the "bursting bubble" theory in this context. *In re Estate of Beecham*, 378 N.W.2d 800, 804 (Minn.1985).

**5.** More specifically, "[a]n implied-in-fact contract is a true contract, containing all necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt." *Bloomgarden v. Coyer*, 156 U.S.App.D.C. 109, 116, 479 F.2d 201, 208 (1973); *accord, Richardson v. J.C. Flood Co.*, 190 A.2d 259, 261 (D.C. 1963).

of this jurisdiction articulated the quantum of proof necessary to rebut the presumption that services rendered to a close, adult relative are gratuitous.[6] Moreover, our review of decisions elsewhere reveals a variety of approaches reflecting a considerable degree of confusion about this issue. *See* 66 Am.Jur.2d *Restitution and Implied Contracts* § 44 (1973) (citing cases). The quantum of proof necessary to rebut the presumption of gratuity has been described, for example, as "clear and convincing," *Gibson v. McCraw*, 332 S.E.2d at 276; *Brassfield v. Allwood*, 557 S.W.2d 674, 681 (Mo.App.1977); *Vosburg v. Smith*, 272 S.W.2d 297, 301 (Mo.App.1954), a "preponderance of the evidence," *In re Estate of Clausen*, 51 Ill.App.3d at 21, 9 Ill. Dec. at 50, 366 N.E.2d at 164; *see also In re Estate of Steffes*, 95 Wis.2d 490, 502 & n. 12, 290 N.W.2d 697, 703 & n. 12 (1980), a "showing of facts disclosing a different state of affairs," *Worley v. Worley*, 388 So.2d 502, 507 (Ala.1980), and "sufficient evidence tending to establish a contract for remuneration," *In re Estate of Bouma*,

206 Neb. 209, 211, 292 N.W.2d 37, 38 (1980). *See also supra* note 4.

■ Having reviewed the various approaches, we conclude that a claimant against a sibling's estate for the reasonable value of services performed for that sibling during his or her lifetime should have the burden to demonstrate, by a preponderance of the evidence, *In re Estate of Clausen*, 51 Ill.App.3d at 21, 9 Ill.Dec. at 50, 366 N.E.2d at 164,[7] the existence of either an express or implied agreement that he or she expected to be paid and that the decedent intended to make payment. *Tuohy*, 19 App.D.C. at 87; *In re Estate of Raketti*, 340 N.W.2d at 902; *Campion v. Tennes*, 93 Ill.App.3d 597, 602, 49 Ill.Dec. 58, 62, 417 N.E.2d 748, 752 (1981) (quoting *Switzer v. Kee*, 146 Ill. 577, 581, 35 N.E. 160, 162 (1893)); *In re Estate of Hill*, 88 Ill.App.3d at 1041, 44 Ill.Dec. at 174, 411 N.E.2d at 80; *supra* note 5. Thus, we reject the approach requiring a claimant to prove the existence of an agreement by "clear and convincing" evidence. *See, e.g., Gibson*, 332 S.E.2d at 276; *Brassfield*, 557 S.W.2d at 681; *Vosburg*, 272 S.W.2d at 301.[8] Al-

6. We note that language in *Tuohy*, 19 App.D.C. at 86, describing a claimant's burden to produce "clear and unmistakable evidence" or "clear and distinct proof" does not apply to the instant case. *Tuohy* concerned a claim by a daughter against her father's estate for services rendered to him during his lifetime. This claim, however, was divided into two parts: services rendered while the daughter was under twenty-one years of age and thus still a minor, and services rendered after she had become an adult. The court's language referred specifically to her claim for services rendered while she was still a minor, when she not only had to overcome the general presumption that services rendered between parent and child are gratuitous, but also had to rebut the presumption that she had not been emancipated by her father. It was to overcome these twin presumptions that the court imposed a more stringent burden of persuasion. As the court itself noted, "the case stands upon quite a different footing after the child attains the full age of 21 years." *Id.* It is notable that the court did not mention the more stringent "clear and distinct" evidentiary burden with respect to the plaintiff's claim for services rendered as an adult. A fair reading of the opinion leads to the conclusion that, while "clear and distinct" proof of an express or implied contract is required for a minor child to recover for services rendered to a parent, the same high standard does not apply to an adult

child who renders services to a parent. Thus, one cannot persuasively argue that *Tuohy* mandates the use of a "clear and convincing" standard in a case involving adult siblings.

7. The evidence to be considered includes the presumption of gratuity created by the family relationship. That presumption, as we have discussed above, continues notwithstanding the introduction of contrary evidence. Thus, the evidence of the alleged contract that must be introduced to create the "preponderance" is necessarily more compelling than that required in cases where there is no presumption operating one way or another.

8. Interestingly, the courts of West Virginia and Missouri considered claims based on an alleged contract to bequeath one's entire estate (*Gibson*) or at least a specific item in it (*Brassfield*), in return for services rendered by a child during the decedent's lifetime. In this context of an alleged contract to make a will, including a contract to devise land that would be unenforceable at law because of the Statute of Frauds (*Brassfield*), these courts have held that equity will not enforce the contract without "clear and convincing proof" of the agreement. *Gibson v. McCraw*, 332 S.E.2d at 274; *Brassfield*, 557 S.W.2d at 679. The same courts also have applied this burden of proof to situations, such as the instant case, where the claim is not to the

though we apply the presumption of gratuity primarily out of a belief that the very existence of a brother-sister relationship, without regard to its actual workings, should be enough to eliminate claims based on a contract implied in law (quasi-contract), we perceive no basis for imposing an additional requirement that the claimant must rebut the presumption by presenting "clear and convincing" evidence of a contract. Family members may be less likely than others to formalize contractual arrangements between themselves, even when remuneration is intended; thus, many if not most family contracts are likely to be implied in fact, not express. Requiring claimants to produce "clear and convincing" evidence of a contract, therefore, would create too difficult a barrier for recovery where it is merited, indeed a barrier higher than is common in civil litigation. *See Green*, 499 A.2d at 877 (under unemployment compensation regulations, quantum of proof required to satisfy employer's burden to prove employee voluntarily quit job "is, as in most civil cases, a fair preponderance of the evidence").

### D.

Because there is no express contract here, we next consider what a claimant must show in order to carry the burden of proving, by a preponderance of the evidence, the existence of a contract implied in fact. We have previously set out the general requirements for obtaining recovery on a quantum meruit theory under a contract implied in fact:

> (1) valuable services must be rendered [by the plaintiff]; (2) for the person sought to be charged; (3) which services were accepted by the person sought to be charged, and enjoyed by him or her; and (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff, in performing such services, expected to be paid.

entire estate (or to a specific item in it) as such but to the reasonable value of the alleged services, *i.e.*, quantum meruit. *Gibson*, 332 S.E.2d at 276; *Vosburg v. Smith*, 272 S.W.2d at 301. Because the instant case concerns only a money claim for the reasonable value of services, we

*TVL Associates*, 474 A.2d at 159 (quoting *In re Rich*, 337 A.2d 764, 766 (D.C.1975)); *see also H.G. Smithy Co.*, 374 A.2d at 893; *Waco Scaffold & Shoring Co. v. 425 Eye Street Associates*, 355 A.2d 780, 783 (D.C. 1976); *Bloomgarden*, 156 U.S.App.D.C. at 116–17, 479 F.2d at 208–09.

 Where the presumption of gratuity applies, the determinative issue usually will be: whether the claimant has reasonably notified the other party, who presumably expects free services, of a clear enough expectation of payment that the recipient's intention to pay can be inferred from acceptance of the services. In evaluating whether the claimant has sustained the burden of persuasion as to the existence of a contract, the factfinder must consider the totality of the circumstances. Such factors as the length of time during which services were performed, the nature of those services, and the respective financial statuses of the parties are relevant. *See, e.g., Capps*, 227 Ark. at 204, 297 S.W.2d at 656 (upholding jury verdict for claimant and pointing to uncontroverted evidence that claimant performed burdensome, extraordinary services over period of ten years); *In re Estate of Clausen*, 51 Ill.App.3d at 21, 9 Ill.Dec. at 50, 366 N.E.2d at 164 (upholding jury verdict for claimant taking into account that decedent's estate was enhanced by receipt of claimant's welfare checks and avoidance of nursing home expenses, claimant performed extraordinary services that were very burdensome, decedent stated he would pay claimant well, and claimant had no assets); *In re Estate of White*, 15 Ill. App.3d 200, 201–02, 303 N.E.2d 569, 571–72 (1973) (listing factors). Because the key question is whether, under the particular circumstances, the parties intended that compensation be paid, the result necessarily will hinge on the facts of each case. *In re Estate of Raketti*, 340 N.W.2d at 902.

do not deal with the quantum of proof necessary to rebut the presumption of gratuity when a claimant attempts to obtain specific performance of an alleged contract for a particular piece of estate property in return for services rendered during the decedent's lifetime.

■ We turn now to whether the trial court applied the law correctly. The trial court's order makes clear that the court required appellant to show by "clear and convincing" evidence that there was an express or implied contract between appellant and Ms. Key:

> The general rule in this jurisdiction is that a promise to pay for services rendered by one family member to another will not be implied from the mere rendition of the services. Rather, it is held that the services are presumed to be gratuitous absent *clear and distinct* proof of an express [or implied] agreement to pay. [ (emphasis added) (citation omitted) ].[9]

This reference to a burden of proof higher than a preponderance of the evidence was not an isolated trial court comment; it unquestionably expressed the court's view of the applicable standard. At a later point in its order, for example, the trial court commented on appellant's evidence:

> Here, Mr. Brown offered no *convincing* corroborating evidence to prove the existence of an agreement with his sister. He provided no indication that they had discussed the amount of compensation or the hourly rate and, as such, provided no *clear and distinct* proof of an express or implied contract to pay. [ (Emphasis added) ].

We are therefore persuaded that the trial court applied an improper standard of proof. *Cf. Waco Scaffold*, 355 A.2d at 783 n. 7 (isolated remark by trial court that appellant failed to prove case by "convincing proof" not sufficient to persuade this court that trial court had applied incorrect standard). Because we cannot say, based on the preponderance-of-evidence standard, that appellant has presented insufficient evidence *as a matter of law* to support his claim, we must remand for the trial court to apply the correct legal standard to the evidence before it.[10] We wish to emphasize, however, that our remand should not be construed as a comment on the persuasiveness of appellant's case. We express no view as to whether appellant has sustained the applicable burden of persuasion.[11]

### III.

Finally, appellant argues that the trial court completely ignored his claims for money spent on behalf of his sister. Although there may have been no agreement to pay appellant for his services, it is conceivable that Ms. Key agreed to reimburse him for out-of-pocket expenses. Accordingly, this claim must be addressed separately.

■ Appellant is correct in pointing out that the trial court did not address this claim at all in its order. We therefore must remand for the trial court to do so. On remand, the court must first determine whether appellant used his own funds on his sister's behalf, as he claims.[12] If the trial court finds that he did so, the court should then divide the claim into two parts: money spent while Ms. Key was still alive (mortgage payment and nursing care), and money spent following Ms. Key's death (funeral expenses). *See supra* note 1. With respect to the mortgage payment and nursing care, we see no reason why the same presumption of gratuity that applies to services between brother and sister should not also apply to support payments. *See In re Estate of Hill*, 88 Ill.App.3d at 1039, 44 Ill.Dec. at 173, 411 N.E.2d at 79.

---

**9.** The trial court cited *Tuohy* for this proposition, but, as we have explained, *supra* note 6, *Tuohy* does not require clear and distinct proof of a contract for services between adult siblings.

**10.** Although the question is close, we believe that the facts in this case are sufficiently different from those in *Farrin v. Harlow*, 62 App.D.C. 314, 67 F.2d 580 (1933), that, had this been a jury trial, the trial court would not have been justified in granting a directed verdict for appellee.

**11.** In addition to the claim based on a contract implied in fact, appellant apparently claims he is entitled to compensation based on a contract implied in law—quasi contract. Because, as elaborated earlier, the presumption of gratuity applies to services rendered in the context of a brother-sister relationship, this claim must fail.

**12.** The trial court made no factual findings on this issue, and we express no views on whether the record supports appellant's claim.

With respect to the funeral expenses, however, this presumption should not apply. Any expenditure following Ms. Key's death is qualitatively different from support payments made during her lifetime and thus cannot be said to fall within the presumption of gratuity. Because we do not know whether the trial court, on remand, will find that appellant paid funeral expenses, we do not address that issue further.

*Reversed and remanded.*